### GOODNIGHT *v.* GOODNIGHT.

1. On the trial of an equitable petition wherein it was prayed that a proper decree be entered, declaring a resulting trust in favor of the plaintiff against the defendant in one half of the lands sued for, it was not error for the court to admit in evidence a letter offered by the plaintiff, written to her by a witness introduced by the defendant, over objection on the sole ground that it was irrelevant and immaterial; the letter tending to show that the writer thereof knew that the plaintiff had paid a part of the consideration for the land upon which she sought to have a resulting trust declared.

2. The verdict is supported by the evidence.

　　　　　No. 3247. JANUARY 20, 1923.

Equitable petition.    Before Judge Tarver.    Gordon superior court.    May 4, 1922.

Miss Alice Goodnight filed her equitable petition against B. B. Goodnight, and alleged in substance the following: In the year 1910 the plaintiff and defendant, who are brother and sister, were single and living together and had with them their mother, who was very old and dependent upon them for support. At this time they owned no home and had never owned one, but had been living on rented land. Defendant learned that certain land could be bought on credit without making any cash payment, and proposed to plaintiff that they buy the land for their home. After considerable discussion of the matter and after studying about it, plaintiff and defendant decided that they could buy the land and pay for it as the payments came due. It was agreed that they should live economically, work hard, and that plaintiff should help her brother in making and gathering the crops, that she should do the cooking and keep house for him, and in every way possible help him and they would buy the land and pay for it, and that when it was paid for it would belong to both of them together. It was agreed and understood that they should live together as members of the same family. In pursuance of this agreement the defendant contracted with J. A. Coley for the purchase of a certain described eighty acres of land in Gordon County, notes were executed, and a bond for title to the land was taken, the purchase-price being approximately $700, and the notes given therefor matured over a period of years. The exact number of notes together with the amount of each and their date of maturity is not known to plaintiff. They were not all paid until February 25, 1918. Although according to the agreement the land was to belong to plaintiff and defendant jointly, defendant took the bond for title in his name only. He told plaintiff afterwards that they could both pay for it and that the land would belong to both of them. Having confidence in her brother and relying upon his promise and agreement, plaintiff permitted the bond for title to remain in his name, expecting that when they had finished paying for the land the deed would be made conveying the same to both of them jointly, according to the understanding and agreement that the land would belong to both of them and would be their home. For eight years, beginning in 1910 and until February 28,

1918, plaintiff worked faithfully and continuously, helping her brother to raise and gather his crops; most of the time performing the services of a field hand as regularly as he did, besides doing all of the cooking, housekeeping, washing, sewing, mending, and milking the cows. During all of this time plaintiff received nothing for her labor, except what she ate at the table which she herself cooked. What little clothing plaintiff received was bought with the money raised from the sale of chickens and eggs that she herself raised. Plaintiff performed all of the above work and lived as scantily as possible, in order that she and her brother might meet the payments on their notes and have a home for her old age. All the notes representing the purchase-price of the land were paid with the proceeds of crops which plaintiff helped to make and gather. One half of the amount paid on the notes was with money belonging to her, and she directed that her brother use it in paying for the land. On February 25, 1918, J. A. Coley executed and delivered a deed conveying title to the land in fee simple to the defendant B. B. Goodnight only. Plaintiff's money paid for a one-half interest in the land under the agreement that she should have title to the same; and she remained in possession of the land with the defendant, living on it as her home until February, 1920, when she was forced to leave by the defendant, who told her that if she did not leave he would kill her, and he would not permit her to remain on her land any longer. She is now 58 years old, is single, and has no one to take care of her; and on account of the hard work and hardships undergone, she is not able to make a living for herself or to earn money to buy another home for her declining years. Prior to the filing of this suit she made a demand upon the defendant that he make her a deed conveying a fee-simple title to a one-half undivided interest in the land in controversy; and the demand was refused by the defendant. By reason of these facts the defendant holds title to a one-half undivided interest in the land in trust for the plaintiff, the same resulting by operation of law. Plaintiff prayed, that the court by proper decree declare a resulting trust in her favor in the land sued for; and that the court grant such other and further relief as seems meet and proper; etc.

The defendant filed an answer denying the material allegations in the petition. The jury on the trial of the case returned a

verdict for the plaintiff for a one-half interest in the land in controversy. The defendant made a motion for new trial, which was overruled, and he excepted.

*M. B. Eubanks,* for plaintiff in error. *Lang & Lang,* contra.

HILL, J. (After stating the foregoing facts.)

1. There is only one special ground of the motion for new trial, and that assigns error on the admission in evidence of a certain letter from a witness introduced by the defendant, Mrs. Etta Parr, addressed to the plaintiff, as follows: " Calhoun, Ga. 1920. Dear Aunt Alice: I got a letter from Mamma a short time ago, and she told me that Uncle Ben had run you off; and it makes me so dam mad when I think of it. I know that you helped to work and pay for the place. I am going to get Buck to go with me in sight of Ben's and get him to get Unie to come out. I will fix her, and she will need a black box. I have talked to Ben and Unie both about the way they were treating you, and they promised me they would treat you right, and they are not doing it. Your niece, Etta Parr." The error assigned is that the court admitted the letter in evidence over the objection that it was " irrelevant and immaterial." It is also said, in this ground of the motion, that " movant insists that admission of said letter in evidence was harmful error and prejudicial to his interests; that the letter was irrelevant, immaterial, and hearsay; that it was a private communication from the witness to the plaintiff, and was not shown to have been authorized by the defendant, nor was it shown that he had any knowledge that such letter had been written, and such letter was not in any way contradictory of any testimony the witness had given, and was not admissible on behalf of the plaintiff upon any grounds whatever." It will be observed that the only objection raised to the introduction of the letter on the trial of the case was that it was irrelevant and immaterial. We are of the opinion that the letter was relevant and material; for the witness stated that she knew that the plaintiff helped to work and pay for the place. But it will also be observed that the insistence of the plaintiff in error now, that the letter was prejudicial and was mere hearsay, etc., was not made at the time of the trial and when the letter was offered in evidence. Therefore, these latter objections not having been raised on the trial of the case, and no ruling of the court having been made thereon, so far as the record discloses,

they can not be considered by this court. We are therefore of the opinion that the court below did not err in admitting the letter over the objection merely that the letter was irrelevant and immaterial.

2. The only other grounds to be considered are the usual general grounds that the verdict is without evidence to support it, etc. While we are of the opinion that the evidence is somewhat meager, we are also of the opinion that it is sufficient to support the verdict in favor of the plaintiff for a recovery of one half of the land sued for. It appears from the evidence that the plaintiff was an illiterate, but a hard-working woman, and that her evidence is in substantial accord with the allegations of her petition. On the trial of the case she testified, in part, as follows: " I am Miss Alice Goodnight. I am now 57 years old. I have never been married. I am a sister of B. B. Goodnight. He is my full brother. Back in 1910 or 1909 my brother was a single man. I lived then down here at Mr. Tom Rogers', with Mr. Rogers. Ben there and my mother lived with me. I did not own a home at that time, and had never owned a home; neither had my brother Ben. About that time Ben and I decided to buy a home, and Ben looked at it 25 times I suppose, and came back and told me what grew on it; said it was growed in beggar lice and all such weeds, and that he believed we could pay for it, and I told him I thought we could. I never did go to see it. I had to stay with Mother. It was to be mine and his, and we were to pay for it by our labor on that place. We had no money. We was to work it out and pay it by raising crops. We had some mules, four mules and two milk cows; that is all we had at that time. I am older than Ben. We decided to buy the place from Mr. Coley up there where we did buy, old Grandpa Coley's place. He contracted for the whole place and sold half of it, he was to give a thousand dollars for the whole lot of land. The part we kept was to cost $500. We paid for it by raising cotton and selling it, what me and him made individually, our own crops. Me and him made those crops, and both my nephews helped, Luther worked two years, and Herschel worked one year. I did the hoeing and picking, during all those years, all but one year. One year I did not work. It was 1913, I think. I worked some that year, but I did very little. I expect seven or eight days in the field that year is all I worked; but the other years

I did all the hoeing and cotton-picking. Brother plowed a little, is all he did. He did not work in the field as much as I did during all those years. He did nothing except the field work towards making money to pay for the farm. We had no other work to do except field work. That is the way we paid for the place. I had all the house work to do, such as that, cutting wood, cooking, and the like, but I counted that simply turns around the house. I had to cut the wood. I cut it and toted it out of the woods, all of it, I did that all the time. Ben would water and feed the horses when plowing them; that's all he did. While I was cooking breakfast, he would get up finally and go out and feed his horse and come back and go to bed till I got breakfast done. I made his clothes, did his sewing for him; and in addition to that I worked in the field as much as he did. I did all this work to pay for that farm, and for a home when I got disabled, so I could not work, so we could live off the rents of it when we got old. We were both single, it was ours together, and we were to have it together; we was not to divide it. I did not expect to marry. He never said he would marry or would not, but I knew it would be my home as long as I lived. He was about 41 or 42 years old when we bought the land. I was to have half interest in the land; me and him was all there was there; the children was all married off. It was our money paid for that land; we both made it. It was as much my crop as his crop from time to time. He never said a word about the deeds, when he brought them home; he said he had them, but did not tell what name they were in. I knew it was our house. He just said all the time that it was our home, that it belonged to both of us, and we didn't make no divide in it. I was to have the same inerest in it as he was. It was to be our home. Time and time again he stated it was to be as much my home as his. There was just one house on the place, and we did not expect to divide the farm. The contract was that it was to be as much mine as his. I don't know exactly when it was he brought the deed and put it in his trunk; it was in 1918, I think, I will not say positively, but I think that was when it was. I didn't see the deed until they showed it up here last August court. It was about three or four years after he got the deed before I left there. I never left there until February, 1920, and I believe it was 1918 he got the deed. I left because he told me to leave."

The above was the plaintiff's evidence on direct examination; and her evidence on cross-examination does not materially differ from that on direct examination. A number of other witnesses were introduced, whose evidence tended to corroborate that of the plaintiff. The evidence for the defendant was in sharp conflict with that of the plaintiff. He testified: " There was not a bit of contract between Alice Goodnight and myself as to the purchase of this or any other lands. Never a word was said between me and her in my life, concerning buying this land. I bought this land. When I left home I didn't know I was going to buy the land myself, and bought it before I got home. I have never at any time made any agreement with her as to anybody owning a half interest in this land except me. I paid for the land with my own money. I suppose it was my own. I got it trading stock, the biggest part of it. I don't recollect how much money I got from the place the first year to pay on the land. There were other heavy bills I had to pay in 1912. Mother died in June, 1911, and I paid her burial expenses the next year out of the crop I made. On December 12, 1913, I paid $102.35. I sold a mule to Collins, and he paid me for the mules," etc. There was some evidence for the defendant, tending to corroborate his testimony.

We are of the opinion that, although the evidence was conflicting, it was a question for the jury; and they having found in favor of the plaintiff against the defendant, and there being evidence to support their finding, we will not disturb the judgment refusing a new trial.

The case of *Gales* v. *Stokeley,* 151 *Ga.* 718 (108 S. E. 34), is relied upon as authority to prevent a recovery in the instant case. The headnote in that case is as follows: " A resulting or implied trust which arises solely from the payment of the purchase-price of land is not created, unless the purchase-money is paid either before or at the time of the purchase. Trusts implied from the payment of the purchase-money or a part thereof must result, if at all, at the time of the execution of the conveyance, where there is, in obtaining such conveyance, no fraud or concealment to the injury of the person paying such purchase-money. *Hall* v. *Edwards,* 140 *Ga.* 765 (79 S. E. 852), and authorities cited; and see *Houston* v. *Farley,* 146 *Ga.* 822, 824 (92 S. E. 635)." We think the facts in the *Gales* case are different from those in the present.

It does not appear from the facts in that case that the portion of the purchase-price of the land contributed by the plaintiff in that case was paid before the execution of the conveyance, as in the present case.  On the contrary it appears from the statement of facts that  through the sale of portions of the property and the application of various amounts, which were largely the proceeds of contributions made by petitioner, payment of the purchase-price was completed shortly prior to the death of Howard White (who held the legal title), which occurred in 1917, although the contract of purchase by Wm. Alexander, the stepfather of Howard White, was prior to April 3, 1879, and the title to the land was taken in the stepsons in 1882; and one of the grounds of demurrer in that case was that the action set forth was based upon a stale demand, and that the facts and circumstances alleged were insufficient in equity to raise or create an implied trust.  Another ground of the demurrer was: "It affirmatively appears that no part of the purchase-price of the lands in question was paid or contributed by the petitioner at the time of or before the execution of the deed from the original vendor to Howard and Jerry White, and that the said lands were not purchased or paid for with money, labor, or other things of value contributed by the plaintiff." And this latter ground is the one upon which the court based its decision. But, under the allegations and proof in the present case, the plaintiff had paid her part of the purchase-price for the land before the execution of the deed which was taken in the name of the defendant.  It may be added also that no demurrer was filed in the present case; and it apparently was tried on the sole issue of whether the plaintiff had paid, by her services and the proceeds of her labor, her half of the purchase-price of the land, as was agreed upon between her and the defendant.

*Judgment affirmed.   All the Justices concur.*